# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

_____

BRUCE EVERETT BENNETT JR.,

                Plaintiff,

        v.                                   No. 15-CV-434

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

                Defendant.

_____

**CHRISTIAN F. HUMMEL**
**U.S. MAGISTRATE JUDGE**


**APPEARANCES:**                          **OF COUNSEL:**

Office of Mark A. Schneider          MARK A. SCHNEIDER, ESQ.
Attorneys for Plaintiff
57 Court Street
Plattsburgh, New York 12901

Social Security Administration,      STEPHEN P. CONTE, ESQ.
Office of General Counsel            Special Assistant U.S. Attorney
Attorneys for Defendant
26 Federal Plaza - Room 3904
New York, New York 10278

## MEMORANDUM-DECISION AND ORDER

Plaintiff Bruce Everett Bennett Jr. ("Plaintiff") brings this action pursuant to 42 U.S.C.

§ 405(g) seeking review of a decision by the Commissioner of Social Security

("Commissioner") denying his application for benefits under the Social Security Act ("Act").

Plaintiff moves for a finding of disability, and the Commissioner cross-moves for a judgment

on the pleadings. Dkt. Nos. 13, 22.

## I. Background

On May 23, 2012, plaintiff protectively filed an application for disability insurance benefits and supplemental security income pursuant to the Social Security Act, 42 U.S.C. § 401 et seq., claiming an alleged onset date of September 29, 2011. T. 128-44. The applications were denied on September 10, 2012. Id. at 63-70. Plaintiff requested a hearing before an administrative law judge ("ALJ"), which was held before ALJ Robert Wright on March 3, 2014. Id. at 74-85, 31-51 (transcript of the hearing). In a decision dated April 23, 2014, the ALJ held that plaintiff was not entitled to disability benefits. Id. at 8-30. Plaintiff filed a timely request for review with the Appeals Council, and on April 9, 2015, the request was denied, thus making the ALJ's findings the final decision of the Commissioner. Id. at 1-5. This action followed.

## II. Discussion

### A. Standard of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision. Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982). Substantial evidence is "'more than a mere scintilla,'" meaning that in the record one can find "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971) (internal quotation marks omitted)).

"In addition, an ALJ must set forth the crucial factors justifying his findings with

sufficient specificity to allow a court to determine whether substantial evidence supports the decision." Barringer v. Comm'r of Soc. Sec., 358 F. Supp. 2d 67, 72 (N.D.N.Y. 2005) (citing Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984)). However, a court cannot substitute its interpretation of the administrative record for that of the Commissioner if the record contains substantial support for the ALJ's decision. Yancey v. Apfel, 145 F.3d 106, 111 (2d Cir. 1998). If the Commissioner's finding is supported by substantial evidence, it is conclusive. 42 U.S.C. § 405(g); see Halloran, 362 F.3d at 31.


### B. Determination of Disability

"Every individual who is under a disability. . . shall be entitled to a disability. . . benefit . . . ." 42 U.S.C. § 423(a)(1). Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." Id. § 423(d)(1)(A). A medically-determinable impairment is an affliction that is so severe that it renders an individual unable to continue with his or her previous work or any other employment that may be available to him or her based upon age, education, and work experience. Id. § 423(d)(2)(A). Such an impairment must be supported by "medically acceptable clinical and laboratory diagnostic techniques." Id. § 423(d)(3). Additionally, the severity of the impairment is "based [upon] objective medical facts, diagnoses or medical opinions inferable from [the] facts, subjective complaints of pain or disability, and educational background, age, and work experience." Ventura v. Barnhart, No. 04 Civ. 9018(NRB), 2006 WL 399458, at *3 (S.D.N.Y. Feb. 21, 2006) (citing Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983)) (additional citation omitted).

The Second Circuit employs a five-step analysis, based on 20 C.F.R. § 404.1520, to determine whether an individual is entitled to disability benefits:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he [or she] is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his [or her] physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him [or her] disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he [or she] has the residual functional capacity to perform his [or her] past work. Finally, if the claimant is unable to perform his [or her] past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

Berry, 675 F.2d at 467. The plaintiff bears the initial burden of proof to establish each of the first four steps. DeChirico v. Callahan, 134 F.3d 1177, 1179-80 (2d Cir. 1998) (citing Berry, 675 F.2d at 467). If the inquiry progresses to the fifth step, the burden shifts to the Commissioner to prove that the plaintiff is still able to engage in gainful employment somewhere. Id. at 1180 (citing Berry, 675 F.2d at 467).

## C. ALJ Wright's Findings

Plaintiff, represented by counsel, testified at the hearing held on March 3, 2014. T. 31-51. Using the five-step sequential evaluation, ALJ Wright found that plaintiff (1) had not engaged in substantial gainful activity since September 29, 2011, the alleged onset date; (2) had the following severe medically-determinable impairments: lumbar and cervical spine

-4-

disorder, and headaches; (3) did not have an impairment, alone or in combination, sufficient

to meet the listed impairments in Appendix 1, Subpart P of Social Security Regulation Part

404; (4) maintained "the residual functional capacity to perform the full range of light as

defined in 20 CFR 404.1567(b) and 416.967(b)"; and, thus; (5) given his age, education,

work experience, and RFC, was capable of engaging in employment which exists in

significant numbers in the national economy.  Id. at 13-19.


### D.  Plaintiff's Contentions

Plaintiff contends that the ALJ (1) erred in finding plaintiff's seizure disorder and

mental impairments non-severe; (2) failed to apply the treating physician rule; (3) failed to

consider plaintiff's non-exertional limitations in determining the RFC; (4) erred in assessing

plaintiff's credibility; and (5) erred in failing to consult a vocational expert at step five.  See

Dkt. No. 13.


### E.  Analysis of Plaintiff's Arguments

### 1.  Severity of Plaintiff's Seizure Disorder

The regulations state that "[i]f [the claimant] do[es] not have any impairment or

combination of impairments which significantly limits [the claimant's] physical or mental

ability to do basic work activities, [the Commissioner] will find that [the claimant] do[es] not

have a severe impairment[.]"  20 C.F.R. § 416.920(c).  A physical or mental impairment "is

an impairment that results from anatomical, physiological, or psychological abnormalities

which are demonstrable by medically acceptable clinical and laboratory diagnostic

techniques." 42 U.S.C. § 423(d)(3).  Basic work activities include the "abilities and

aptitudes" that are necessary to perform most jobs.  20 C.F.R. § 4043.1521(b).  Basic work

activities include:

> (1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;
> (2) Capacities for seeing, hearing, and speaking;
> (3) Understanding, carrying out, and remembering simple instructions;
> (4) Use of judgment;
> (5) Responding appropriately to supervision, co-workers and usual work situations; and
> (6) Dealing with changes in a routine work setting.

Id.  The "mere presence" of an impairment is insufficient to deem the impairment severe

under the regulations.  Rodda v. Colvin, No. 5:12-cv-1480 (MAD), 2013 WL 6839576, at *3

(N.D.N.Y. Dec. 27, 2013).  Plaintiff bears the burden at step two of proving that he suffers

from a severe impairment.  Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987); Butts v.

Barnhart, 388 F.3d 377, 383 (2d Cir. 2004).

Plaintiff asserts that the ALJ erred in finding that "his seizure disorder, mental illness,

cognitive limitations, and borderline intelligence" were not severe impairments.[1]  Dkt. No. 13

at 26.[2]

Here, there are no laboratory findings indicating that plaintiff suffered from a seizure

disorder.  Dr. Ellen Gaughan, M.D., plaintiff's neurologist, noted that plaintiff suffered from a

---

[1]  The Court will address plaintiff's argument regarding his mental impairments in the following section.

[2]  The Court notes that plaintiff's brief is sparse in regard to a legal argument supporting this point of contention.  Plaintiff's brief states that the ALJ erred by finding that his seizure disorder, mental illness, cognitive limitations, and borderline intelligence were not severe impairments, but fails to support this argument with any colorable argument.  Dkt. No. 13 at 26.  In fact, plaintiff's counsel merely states the analysis to be applied at step two, and then segues into an explanation of the analysis to be applied at step five of the sequential evaluation.  Id.  Nonetheless, the undersigned has reviewed the record at length to determine whether plaintiff's argument is meritorious.

"questionably nonruptured brain aneurysm." T. 475. Despite Dr. Gaughan's prescribing plaintiff three different medications in order to control his reported seizures, none worked, or plaintiff reported prohibitive side effects. Id. at 479. On November 1, 2012, Dr. Gaughan diagnosed "partial epilepsy, without mention of impairment of consciousness, without mention of intractable epilepsy." Id. Plaintiff's girlfriend reported that he had "daily episodes of staring" that lasted for two minutes. Id. at 481. On July 31, 2013, Dr. Gaughan opined that plaintiff may have a "possible seizure disorder," but also noted that there were no signs of aneurysm on an MRI and MRA of the brain. Id. at 482. On August 12, 2013, Dr. Gaughan stated that plaintiff "appear[ed]" to have seizures, but that the seizures had responded to his current medication. Id. at 486. His neurologic examination on that day was unremarkable. Id. at 485. In September 2013, plaintiff complained of memory difficulty, which Dr. Gaughan noted could be related to a non-convulsive seizure. Id. at 490. Dr. Gaughan noted that plaintiff's staring spells had decreased since he started Topiramate. Id. In October 2013, plaintiff reported staring spells and seizures. Id. at 493. In January 2014, plaintiff's "seizure threshold" was lowered. Id. at 495.

The ALJ found that plaintiff's seizure disorder did not result in more than a minimal limitation in his ability to perform basic work-related activities, and therefore was non-severe. T. 14. Given that the medical records do not contain any conclusive, objective medical testing regarding plaintiff's possible seizure disorder, the ALJ's conclusion that plaintiff's seizure disorder was non-severe under the regulations is supported by substantial evidence. Dr. Gaughan's treatment of plaintiff was based largely on plaintiff's own reported symptoms, as evidenced by the medical records. Accordingly, the Court finds that while there were some clinical findings to indicate that plaintiff experiences seizures, there was

also substantial evidence for the ALJ to conclude that plaintiff's possible seizure disorder did not rise to the level of a severe impairment.  See Rodda, 2013 WL 6839576, at *5 (finding that the ALJ's conclusion that plaintiff's alleged seizure disorder was not a severe impairment was supported by substantial evidence).

## 2. Severity of Plaintiff's Mental Impairments

The Commissioner has promulgated additional regulations regarding analysis of the severity of mental impairments at steps two and three.  Once the ALJ finds that the claimant has a medically determinable mental impairment, the ALJ must apply a "special technique" to assess the claimant's degree of functional limitation resulting from the impairment in four discreet areas.  Kohler v. Astrue, 546 F.3d 260, 265 (2d Cir. 2008).  The four functional areas are: "[a]ctivities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation."  20 C.F.R. § 404.1520a(c)(3).  If the degree of limitation in each of the first three functional areas is "mild" or better, and no episodes of decompensation are present, then the claimant's mental impairment is not severe.  Id. § 404.1520a(d)(1).  Most importantly, the ALJ must specifically document his or her findings in each of the four functional areas.  Kohler, 546 F.3d at 266.

Plaintiff argues that the ALJ erred in failing to apply the special technique in determining whether plaintiff's mental impairments are severe.  Dkt. No. 13 at 32-33.  Specifically, plaintiff argues that the ALJ erred in failing to consider his GAF score of 30 in assessing the severity of his mental impairments.  Id. at 32.  Defendant contends that the ALJ explicitly performed the special technique.  Dkt. No. 22 at 8-9.

The ALJ made specific findings regarding each of the four functional areas in his

decision, with citations to the available exhibits.  T. 17.  Thus, plaintiff's argument that the ALJ failed to apply the special technique is patently meritless.

Plaintiff further argues that the ALJ erred in not considering his GAF score from his May 2011 psychiatric hospitalization.  Dkt. No. 13 at 32.  Plaintiff's reliance on Smith v. Colvin, 935 F. Supp. 2d 946 (N.D.N.Y. 2013) is misplaced.  In Smith, the Court found that the ALJ erred in failing to consider the claimant's GAF score when assessing whether the claimant's impairment was functionally equivalent to a listing at step three of the sequential evaluation.  Smith, 935 F. Supp. 2d at 505.  The assessment at issue in Smith concerned the ALJ's findings at step three, but in this case, plaintiff argues that the ALJ should have considered plaintiff's GAF score at step two.  Dkt. No. 13 at 32-33.  There is no support in the regulations for this contention.  Thus, plaintiff's claim that the ALJ should have considered plaintiff's GAF score at step two is also meritless.[3]

### 3.  Treating Physician Rule

When evaluating a claim seeking disability benefits, factors to be considered include objective medical facts, clinical findings, the treating physician's diagnoses, subjective evidence of disability, and pain related by the claimant.  Harris v. R.R. Ret. Bd., 948 F.2d 123, 126 (2d Cir. 1991).  Generally, more weight is given to a treating source.  Under the regulations, a treating physician's opinion is entitled to controlling weight if it is well-

---

[3]  Plaintiff's brief cites to one other Northern District of New York case in support of this proposition. Dkt. No. 13 at 32.  However, that case is unsupportive of plaintiff's position for the same reasons explained by the Court in regard to the Smith case.  In Armstead v. Astrue, No. 1:04-CV-503 (NAM/RFT), 2008 WL 4517813, at *21 (N.D.N.Y. Sept. 30, 2008), the Court finds that the claimant's GAF score is indicative but not dispositive that the claimant has marked limitations in a functional domain used to determine whether the claimant meets a listing.  Thus, the cited case also concerns use of a GAF score at step three of the sequential evaluation, not step two.

supported by medically acceptable clinical and laboratory diagnostic techniques and is

consistent with other substantial evidence in the record.  20 C.F.R. § 404.1527(d)(2) (2005);

Shaw, 221 F.3d at 134.  Before a treating physician's opinion can be discounted, the ALJ

must provide "good reasons."  Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998).

The ALJ is required to assess the following factors in determining how much weight

to accord the physician's opinion: "(i) the frequency of examination and the length, nature,

and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the

opinion's consistency with the record as a whole; (iv) whether the opinion is from a

specialist; and (v) other relevant factors."  Schaal, 134 F.3d at 503.  If other evidence in the

record conflicts with the opinion of the treating physician, this opinion will not be deemed

controlling or conclusive, and the less consistent the opinion is, the less weight it will be

given.  Snell v. Apfel, 177 F.3d 128, 134 (2d Cir. 1999).  Ultimately, the final determination

of disability and a claimant's inability to work rests with the Commissioner.  Id. at 133-34;

see 20 C.F.R. § 404.1527(e).

Here, plaintiff argues that the ALJ erred in determining the weight afforded to each

medical opinion in the record.[4]  See T. 16-24.  The Court will address the pertinent medical

records and opinions of each medical source below.[5]

**a.  Dr. H. Ferrin, Psychology**

Dr. Ferrin completed a Psychiatric Review Technique on September 6, 2012.  T. 318-

---

[4]  Again, it is unclear from plaintiff's brief what, exactly, he objects to within the ALJ's decision. Plaintiff states that the ALJ erred in not affording the "proper weight to the respective medical sources" but makes no cognizable legal argument.  See Dkt. No. 13 at 24.

[5]  Treatment notes from Dr. Gaughan are summarized in section II.E.1, infra.

31.  Dr. Ferrin noted that plaintiff had been diagnosed with major depressive disorder; post-traumatic stress disorder; and alcohol dependence in remission, during a consultative examination.  Id. at 321, 323, 326.  Dr. Ferrin opined that plaintiff had mild restrictions in activities of daily living; moderate restrictions in maintaining social function, and concentration, persistence or pace; and no repeated episodes of deterioration.  Id. at 328.  Dr. Ferrin also completed an RFC assessment, and opined that plaintiff would be moderately limited in the following areas: ability to understand and remember detailed instructions; ability to carry out detailed instructions; ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and ability to interact appropriately with the general public.  Id. at 332-33.  Despite his limitations, Dr. Ferrin stated that plaintiff would be able to understand and remember instructions, and sustain attention and concentration for tasks.  Id. at 334.

### b.  Dr. Brett T. Hartman, Psy. D.

Dr. Hartman performed a consultative psychiatric evaluation of plaintiff on August 10, 2012.  T. 265-69.  Plaintiff reported his psychiatric hospitalization in 2011, and stated that he was taking Nortriptyline.  Id. at 265.  Plaintiff also reported that he suffered from migraine headaches.  Id.  He had trouble sleeping because of his agitation and pain.  Id. at 266.  He further reported many symptoms of depression, including loss of appetite, feelings of sadness and isolation, crying spells, angry outbursts, impaired concentration and memory, poor impulse control, and suicidal thoughts.  Id.

Plaintiff reported five DWI convictions.  T. 266.  He had been sober for three and a half years at the time of the examination, and reported that he attended Alcoholics Anonymous meetings.  Id.

Plaintiff presented to Dr. Hartman as "a cooperative, sullen, and agitated individual." T. 267.  He was well-groomed, but restless.  Id.  His posture was slouched.  Id.  His speech was fluent, but monotonous.  Id.  His mood was dysphoric, and his affect was oriented.  Id. However, he was alert and oriented, and his thought processes were coherent and goal-directed.  Id.

Dr. Hartman noted that plaintiff was "mildly impaired" in his attention and concentration, and recent and remote memory skills.  T. 267.  He could count without difficulty, but made mistakes in calculations, and performed slowly.  Id.  His cognitive functioning "[a]ppeared to be significantly below average with a lower than average general fund of information."  Id.  His insight and judgment were fair.  Id. at 268.

Plaintiff reported that he was able to dress, bathe, and groom himself.  T. 268.  He could perform cooking and cleaning.  Id.  He could not do laundry, or go shopping on his own.  Id.  He became agitated in stores.  Id.  His wife handled the finances.  Id.  He reported that he does not drive.  Id.  He spent his days walking his yard, spending time with his wife, watching the television, and laying down.  Id.  He stated that he hoped to return to work.  Id.

Dr. Hartman offered the following Medical Source Statement ("MSS"):

> The claimant is able to follow and understand simple directions. He has mild difficulty maintaining attention and concentration. He has mild difficulty maintaining a regular schedule.  He has moderate problems learning new tasks.  He has mild difficulty making appropriate decisions.  The claimant is likely to have problems performing a variety of tasks given his stated physical concerns.  He has moderate difficulty relating adequately with

-12-

others.  He has moderate to marked difficulty dealing
appropriately with the normal stressors of life.

T. 268.  The results of Dr. Hartman's examination were "consistent with psychiatric

problems and cognitive deficits."  Id.  Plaintiff's mental impairments were diagnosed as:

moderate major depressive disorder; post-traumatic stress disorder; pain disorder

associated with general medical condition; learning disorder, by history; alcohol

dependence, in remission; rule out cognitive disorder; rule out borderline intellectual

functioning.  T. 268-69.  Dr. Hartman recommended counseling, and stated that plaintiff's

prognosis was guarded, given the multiple and long-term nature of his symptoms.  Id. at

269.


### c.  Dr. Nader Wassef, M.D. - Consultative Examiner

Dr. Wassef examined plaintiff on August 10, 2012.  T. 270-76.  Plaintiff reported that

his ailments included diabetes; migraine headaches; constant neck pain; lower back pain;

and neuritis of the hands, neck, face, back, and feet.  Id. at 270-71.  He reported smoking

cigarettes and drinking beer.  Id. at 271.  He stated that he cooked two to three times per

week; cleaned twice per week; did laundry once per week; shopped once per week; and

provided child care twice per week.  Id.  He stated that he did not bathe or dress himself,

and that he needed help dressing himself.  Id.  He liked to watch the television, listen to the

radio, and read.  Id.

Upon physical examination, Dr. Wassef noted that plaintiff's gait was normal, and

that he appeared in no acute distress.  T. 271.  He could walk on his heels and toes without

difficulty.  Id.  He could fully squat.  Id.  He used no assistive devices, and did not need any

help getting on or off the examination table.  Id. at 272.  A review of plaintiff's systems was largely unremarkable, except that he was in discomfort during an the examination of his neck and lower back.  Id.  Both plaintiff's lumbar and cervical spinal examinations were normal, with full flexion, extension, and rotary movement.  Id.  Dr. Wassef did not observe scoliosis, kyphosis, or abnormality in plaintiff's thoracic spine.  Id.  The only diagnoses that Dr. Wassef reported were plaintiff's self-reported impairments.  Id. at 273.

### d.  Dr. Paul Roa, M.D. - Pain Management

Dr. Roa saw plaintiff for an initial pain management consultation regarding his back pain on October 29, 2012.  T. 347-49.  Plaintiff reported pain in his low back that became worse with activity.  Id. at 347.  Objectively, Dr. Roa observed tenderness in the lumbar spine, and some limited flexion.  Id. at 348.  Dr. Roa also observed plaintiff's pain upon lumbar extension.  Id.  An MRI showed evidence of facet hypertrophy, and Dr. Roa suggested a lumbar medial branch block in order to clarify the diagnosis.  Id.  Dr. Roa also noted "clear signs of radiculitis."  Id.

Plaintiff was seen by Dr. Farah Siddiqui, M.D., for a follow-up examination on November 13, 2012.  T. 350-51.  He reported that Oxycodone did not help his lower back pain.  Id. at 350.  He further stated that he experienced pain radiating down his right leg.  Id.  An objective examination was unremarkable.  Id.  Dr. Siddiqui stated that plaintiff was a good candidate for a medial branch block.  Id.

On November 30, 2012, plaintiff reported "much better pain relief" on his current medications.  T. 352.  An objective examination was unremarkable.  Id.

On December 19, 2012, plaintiff received lumbar medial branch blocks.  T. 354-53.

The physician administering the injections, Dr. Thierry P. Bonabesse, M.D., observed that plaintiff's spine exhibited normal alignment and segmentation. Id. at 354. At a follow-up visit with Dr. Roa on January 9, 2013, plaintiff reported that he did not have any pain relief following the injections, and that his back pain was worsening. Id. at 356. Dr. Roa recommended physical therapy. Id. A straight leg raise test was positive bilaterally, and Dr. Roa recommended an epidural steroid injection. Id.

An EMG performed on January 31, 2013 revealed evidence of chronic left lumbosacral radiculopathy affecting the S1 nerve root; bilateral sural nerve slowing; and possible right L4 radiculitis. T. 358. Plaintiff received a lumbar epidural injection on February 7, 2013. Id. at 361-62.

On March 7, 2013, plaintiff reported to Dr. Siddiqui that the epidural injection did not give him any pain relief. T. 439. He reported sweating on the right side of his body, changes in his headache pattern, and radiating pain down his legs. Id. He also reported a sixty-four pound weight loss. Id. An objective examination was unremarkable. Id. Dr. Siddiqui provided plaintiff with a script for a right wrist splint after observing symptoms of carpal tunnel syndrome. Id.

In March and April of 2013, plaintiff was advised during follow-up visits to continue with his chiropractic treatment. T. 441-42. He declined injections. Id.

On May 8, 2013, plaintiff reported that his physical therapy sessions were not helping his pain. T. 443. An MRI showed a tear at the L5/S1 and degenerative joint disease at the L3/4, and L4/5. Id. Plaintiff agreed to have another medial branch block to combat his neck pain and headaches. Id. He was administered the medial branch block on June 6, 2013. Id. at 445-46. On June 25, 2013, plaintiff reported that the injection did not help his pain.

Id. at 447.

On July 26, 2013, plaintiff continued to complain of pain. T. 449. An recent MRI showed a minimal disc bulge at the C5/6 and C6/7 protrusion. Id. An objective examination was otherwise normal. Id. A urine drug screen was positive for marijuana. Id.

On July 29, 2013, plaintiff had a follow-up visit with Dr. Roa. T. 451-52. Plaintiff exhibited limited flexion and extension. Id. at 451. He could lateral bend to thirty degrees. Id. A straight leg raise test was positive on the left side. Id. He had weakness in plantar flexion. Id. His right leg strength was five out of five and his patella and Achilles reflexes were normal. Id. Dr. Roa opined that the combination of focal weakness in the left lower leg; MRI findings of annular tears at L5/S1 with disc protrusion; and EMG findings of left S1 radiculopathy, necessitated a left S1 transforaminal epidural steroid injection. Id. Because of MRI findings indicating discopathy in the cervical spine, Dr. Roa recommended another steroid injection in that area as well. Id. at 452. Plaintiff received the injections on October 8, 2013, and October 29, 2013. Id. at 455-58.

On October 30, 2013, plaintiff reported neck pain, mainly on the left side, in the trapezius and shoulder. T. 459. Dr. Roa observed that he could have a possible impingement of the C5 nerve. Id. Dr. Roa suggested another injection. Id. Plaintiff continued to report back pain on November 27, 2013, but stated that the pain improved with medication. Id. at 461. Dr. Roa suggested another injection. Id. On January 21, 2014, plaintiff underwent a left S1 and L5 transforaminal epidural steroid injection. Id. at 463-64.

### e. Aaron Perkins - Physical Therapy

Plaintiff was examined by Perkins on February 20, 2013. T. 364-65. Plaintiff

reported significant neck, mid back, and low back pain.  Id. at 364.  He also reported

significant difficulties in performing functional activities.  Id.  Perkins observed forward-head

posture, increased thoracic kyphosis as well as leaning forward type posterior to avoid

lumbar extension.  Id.  Plaintiff's head and neck appeared to remain in flexion.  Id.  Plainitff's

active ranges of motion were decreased, and plaintiff experienced pain upon rotation,

flexion, and extension.  Id.  Sensation was decreased in plaintiff's left arm, leg, and side of

his trunk.  Id.  Lumbar and cervical compressions were positive for increased pain.  Id.

Perkins noted that cervical spine x-rays from August 1, 2012, and a left shoulder x-ray from

August 11, 2012 showed no significant findings.  Id.  Lumbosacral AP and lateral x-rays

from the same date showed minimal degenerative facet disease at L5-S1.  Id.  A lumbar

spine x-ray showed L3-L4 facet arthropathy, L4-L5 facet arthropathy, L5-S1 facet

arthropathy, and an anular tear at L5.  Id.  A left shoulder MRI from November 8, 2012

showed tendinosis of the supraspinatus tendon.  Id.  Perkins performed manipulations and

stretching.  Id. at 365.


### f.  Dr. Joseph H. Arguelles, M.D.

Plaintiff was examined by Dr. Joseph H. Arguelles, M.D., on June 19, 2013.  T. 417.

He complained of low back and low thoracic pain.  Id.  Dr. Arguelles noted that his pain was

"very non-specific."  Id.  His recent lumbar MRI was normal.  Id.  Dr. Arguelles opined that

the multiple injections that plaintiff was receiving were doing more harm than good.  Id. at

419.  He stated that plaintiff was not a candidate for neurosurgical intervention, but that he

would benefit from postural correction and conditioning.  Id.  Plaintiff exhibited "a very

marked saggital imblance" and "marked kyphosis extending through the upper thoracic and

into the cervical spine." Id. He recommended against further invasive treatments. Id.

### g. Robert Hemond, Physician Assistant

Plaintiff was examined by Hemond on July 18, 2013. T. 499-502. Hemond found that a physical examination was "not concordant with radiculopathy." Id. at 501. Plaintiff also exhibited five out of five Waddell signs, indicating that there was a "psychosocial overlay in his pain." Id. Hemond disagreed with prior assessments of plaintiff's MRI results, and opined that the MRI did not show any signs of nerve impingement. Id. Hemond stated that the multiple injections plaintiff received likely increased his pain because they were not treating the areas actually causing his pain. Id. at 501-02. He recommended that plaintiff discontinue injections and narcotics and consult a psychiatrist. Id. at 502.

### h. Sarah Howell, Family Nurse Practitioner

Plaintiff was examined by Howell on January 31, 2013. T. 382-83. An objective examination was largely unremarkable. Id. Objective examinations in May and August 2013 were also unremarkable. Id. at 383, 508. During plaintiff's August 2013 examination, Howell noted that plaintiff was "obviously very depressed" and stressed the importance of psychiatric care. Id. at 508. On January 16, 2014, Howell noted that there was no change in plaintiff's condition, but he was reporting increased restlessness while on his current medication. Id. at 505. On March 6, 2014, plaintiff reported body aches and muscle fatigue. Id. at 519. Howell noted that there was "some difficulty" in adjusting plaintiff's mood. Id. She also noted that he was unable to work at the time. Id.

### i. Application of the Treating Physician Rule

The ALJ afforded "some weight" to Dr. Gaughan's opinion; "some weight" to Dr. Hartman's opinion; and "little weight" to Dr. Ferrin's opinion. T. 14, 16. The ALJ afforded "some weight" to Dr. Roa's and Howell's opinions. Id. at 25.

In determining plaintiff's RFC, an ALJ "must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis." Social Security Ruling ("SSR") 96-8P, 1996 WL 374184, at *1 (S.S.A. July 2, 1996). "In other words, the ALJ must make a function by function assessment of the claimant's ability to sit, stand, walk, lift, carry, push, pull, reach, handle, stoop, or crouch, based on medical reports from acceptable medical sources." Knighton v. Astrue, 861 F. Supp. 2d 59, 66 (N.D.N.Y. 2012). Here, there is no opinion in the record from either a treating or consulting medical source regarding plaintiff's physical impairments. In determining that plaintiff can perform the full range of light work, the ALJ cites to numerous treatment notes in the record, but fails to assess plaintiff's work-related abilities. Although there is no per se rule in this Circuit as to whether an ALJ's failure to perform a function-by-function analysis requires remand, the failure of the ALJ to perform any analysis as to plaintiff's functional abilities warrants remand. Knighton, 861 F. Supp. 2d at 67; Hilsdorf v. Comm'r of Soc. Sec., 724 F. Supp. 2d 330 (E.D.N.Y. 2010); cf. Casino-Ortiz v. Astrue, No. 06 Civ. 0155(DAB)(JCF), 2007 WL 2745704, at *13 (S.D.N.Y. Sept. 21, 2007) (finding the ALJ's failure to perform a strict function-by-function analysis was obviated where the ALJ explained how the evidence supported his conclusions about the claimant's limitations, and discussed the claimant's ability to perform sustained work activities).

Even if the Court were to consider whether the ALJ's failure to perform a function-by-

function analysis was harmless error, the answer would be in the negative. While a physician's opinion that a claimant is "disabled" is not determinative, as the ultimate decision of whether a claimant is disabled is reserved to the Commissioner, the ALJ still must apply the treating physician rule. Veresan v. Astrue, No. 06 CV 5195(JG), 2007 WL 1876499, at *5 (E.D.N.Y. June 29, 2007). Additionally, the ALJ is required to give "good reasons" for his or her decision of the weight to be afforded to a treating physician's opinion. Id. Here, Dr. Roa's treatment notes indicated that plaintiff was "100% disabled." T. 452, 460. However, the ALJ made no effort to reconcile this opinion with the evidence in the record, despite objective findings indicating plaintiff's impairments. For example, an MRI from May 2013 showed a tear at the L5/S1, as well as degenerative joint disease. T. 443. A later MRI showed disc bulging at the C5/6 and C6/7 protrusion. Id. at 449. EMG findings showed left S1 radiculopathy. Id. at 451. The ALJ also failed to assess the required factors[6] before assigning less than controlling weight to Dr. Roa's opinion. See Crossman v. Astrue, 783 F. Supp. 2d 300, 308 (D. Conn. 2010) (stating that the ALJ must "explicitly consider" several factors before assigning less than controlling weight to the opinion of a treating physician) (internal quotation marks omitted).

Furthermore, the ALJ noted in his decision that plaintiff's treating physicians—Dr. Roa and Dr. Gaughan—did not submit opinions regarding plaintiff's specific functional

---

[6] These factors, known as the "Halloran factors," are:

> (1) the frequency of examination and length, nature, and extent of the treatment relationship; (2) the evidence in support of the physician's opinion; (3) the consistency of the opinion with the record as a whole; (4) whether the opinion is from a specialist, and (5) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion.

Halloran, 362 F.3d at 32.

capabilities.  T. 24.  Given that there were no medical opinions from an examining source as to plaintiff's functional limitations, the ALJ should have sought out clarifying information from plaintiff's treating physicians.  See Hooper v. Colvin, No. 15-CV-6646 (JLC), 2016 WL 4154701, at *13 (S.D.N.Y. Aug. 5, 2016) (remanding where "the ALJ made [a] disability determination based on a record devoid of any truly complete medical opinion."); Hernandez v. Comm'r of Soc. Sec., No. 1:13-cv-959 (GLS/ESH), 2015 WL 275819, at *2 (N.D.N.Y. Jan. 22, 2015) ("Without the advice of . . . a medical source, the ALJ, as a layperson, cannot bridge the gap between [the claimant's] impairments and the functional limitations that flow from those impairments.").

Accordingly, this matter is remanded.  Upon remand, the ALJ is directed to seek a proper medical opinion(s) from plaintiff's treating physicians regarding plaintiff's functional limitations.  The ALJ is further directed to assign weight to any opinion received in accordance with the treating physician rule.

### j.  Remaining Points of Error

"The Second Circuit has held that a remand for further proceedings is particularly appropriate where additional findings or explanation will elucidate the rationale for the ALJ's decision."  Antonetti v. Barnhart, 399 F. Supp. 2d 199, 201 (W.D.N.Y. 2005) (citing Pratts v. Chater, 94 F.3d 34, 39 (2d Cir. 1996)).  Since remand is necessary based on the errors identified above, it is unnecessary to address plaintiff's remaining points regarding ALJ Wright's assessment of plaintiff's credibility; incorporation of plaintiff's non-severe impairments in the RFC assessment; and his failure to consult a vocational expert at step five.  However, after reviewing plaintiff's remaining points of error, the undersigned finds

that none are patently frivolous, and directs the ALJ to consider them when making a new determination.

## III.  Conclusion

Having reviewed the administrative transcript and the ALJ's findings, the Court concludes that the ALJ's determination is not supported by substantial evidence.  Remand for further administrative action consistent with this Memorandum-Decision and Order is needed.  Accordingly, it is hereby

**ORDERED** that plaintiff Bruce Everett Bennett Jr.'s motion for judgment on the pleadings (Dkt. No. 13) is **GRANTED**.  The matter is remanded to the Commissioner for additional proceedings consistent with the above, pursuant to sentence four of 42 U.S.C. 405(g); and it is further

**ORDERED** that the Commissioner's motion for judgment on the pleadings (Dkt. No. 22) is **DENIED**; and it is further

**ORDERED** that the Clerk of the Court serve copies of the Memorandum Decision and Order on the parties in accordance with Local Rules.

**IT IS SO ORDERED.**

Dated:      September 29, 2016
             Albany, New York

Christian F. Hummel
U.S. Magistrate Judge